TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89512
(775) 337-0323
keysercooper@lawyer.com
*Attorney for Plaintiffs Lemus, Madison, and Berger*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

MATEO L. LEMUS, BRYAN S. MADISON,
and JAKE T. BERGER,

          Plaintiffs,

      vs.

WASHOE COUNTY SCHOOL DISTRICT,
STEVE STRUZYK, and TOM BROWN,

          Defendants.

_____/

Case No.

**COMPLAINT**

**JURY DEMAND**

## PRELIMINARY STATEMENT

Public policy in Nevada prohibits bullying. Students who experience taunting, mocking, belittling, and name-calling are encouraged to report it. When an investigation reveals bullying has occurred, a school is required to take reasonable steps to end the offensive conduct and craft remedies to minimize burdens on targeted students. Public policy demands prompt and immediate action so that schools are safe and respectful learning environments.

School officials have important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. The primary duty of school officials and teachers is the education and training of young people; without establishing discipline and

maintaining order, teachers cannot begin to educate their students. However, while public schools are not necessarily run as a democracy, neither are they run as Stalinist regimes. School officials, even exalted football coaches, do not have the unfettered authority to bully, taunt, name-call, or mock students with the use of put-downs or demeaning humor.

In this First Amendment retaliation case, the Plaintiffs, three high school varsity football players, allege they were retaliated against by their football coach because they respectfully and appropriately opposed his bullying, intimidation and name-calling. These students did precisely what our laws demand, they opposed unlawful bullying and stood up for public policy. In return, they were punished. They were kicked off the football team and saw their college football prospects diminish.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction of this action pursuant to 28 U.S.C. Sections 1331, 1343, 2201, and 42 U.S.C. 1983 and 1988.

2.     Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district. This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. Section 2201 and Federal Rules of Civil Procedure ("FRCP"), Rule 57.

## PARTIES

3.     Plaintiff MATEO L. LEMUS ("LEMUS"), is a citizen of the United States residing in the County of Washoe in Nevada and at all relevant times is and was a senior at Galena High School in Southwest Reno, and a former varsity football captain at Galena High School.

4.     Plaintiff BRYAN S. MADISON ("MADISON"), is a citizen of the United States residing in the County of Washoe in Nevada and at all relevant times is and was a senior at Galena

2

High School in Southwest Reno and a former varsity football captain at Galena High School.

5.     Plaintiff JAKE T. BERGER ("BERGER"), is a citizen of the United States residing in the County of Washoe in Nevada and at all relevant times is and was a senior at Galena High School in Southwest Reno and a former varsity football captain at Galena High School.

6.     Defendant WASHOE COUNTY SCHOOL DISTRICT ("WCSD") is a public entity duly incorporated and operating under Nevada law as a school district.

7.     Defendant STEVE STRUZYK ("STRUZYK") is and was, at all times pertinent hereto, the Head Football Coach at Galena High School in Southwest Reno. All actions by STRUYZK were taken under color of state law and in the course and scope of his employment with WCSD.

8.     Defendant TOM BROWN ("BROWN") is and was, at all times pertinent hereto, the Principal at Galena High School in Southwest Reno. Nevada. All actions by BROWN were taken under color of state law and in the course and scope of his employment with WCSD.

9.     Each individual Defendant is sued in his individual capacity.

**FACTUAL BACKGROUND**

10.     Bullying is prohibited in Washoe County Schools. State law does not distinguish between bullying done by students against students or by teachers against students—bullying is forbidden regardless of the perpetrator. Schools in WCSD are required to train teachers, coaches, and employees to recognize bullying and to take aggressive steps to prevent it.

11.     NRS 388.122 defines bullying as the written, verbal or electronic expressions or physical acts or gestures, or any combination thereof, that is directed at a person or group of persons, or a single severe and willful act or expression that is directed at a person or group of persons, that has the effect of creating an intimidating or hostile educational environment for the

person; or substantially interfering with the academic performance of a pupil or the ability of the person to participate in or benefit from services, activities or privileges provided by the school. Nevada's anti-bullying legislation grants no exception for football coaches.

12.     The WCSD Parent Student Handbook describes bullying as the intentional attempt, by one or more individuals, to inflict physical hurt and/or psychological distress on one or more victims. There must be a real or perceived imbalance of physical or psychological power, with the bully actually being stronger or perceived to be stronger than the victim. The bullying may be direct, with face-to-face physical or verbal confrontations, or indirect, with less visible actions such as spreading rumors or social exclusion.

- The WCSD Parent Student Handbook describes harassment as unwanted conduct which has the purpose or effect of violating another person's dignity or creating an intimidating, hostile or humiliating environment towards another.

- The WCSD Parent Student Handbook mandates that nothing in its bullying and harassment policies shall be construed or interpreted to prohibit or in any way to discourage the genuine discussion of issues or use of materials for academic, educational, or instructional purposes.

13.     The WCSD Handbook for Activities & Athletics offers guidance for coaches. It encourages coaches to treat their players with respect, behave as positive role models, and promote fair play, sportsmanship, ethics and morality. The handbook strongly discourages foul and abusive language directed at students. It states: "The mission and purpose of extracurricular and athletic programs in the Washoe County School District is to promote the physical, mental, moral, social and emotional growth of its participants." The Handbook advises coaches:

- Each student athlete should be treated as though he or she was the coach/advisor's own child, and his or her welfare should be uppermost at all times.

- The coach/advisor shall be aware that he or she has a tremendous influence on the education of the student athlete and, thus, shall never place the value of winning above the value of instilling the highest ideals of character.

- The coach/advisor shall uphold the honor and dignity of the profession. In all

personal contact with the student athlete, officials, athletic directors, school administrators, the state high school athletic association, the media, and the public, the coach/advisor shall strive to set an example of the highest ethical and moral conduct.

- The handbook encourages coaches to be a positive role model on and off the field and shall further the mental, social and moral development of students and teach life skills that enhance personal success and social responsibility and to uphold the honor of the profession in all relations with students, colleagues, coaches, advisors, administrators and the general public.

- The coach must treat the traditions of the sport and other participants with respect.

- The coach must be a good listener and adjust to the problems and needs of the players.

- The coach must care more about the development and overall well-being of the players than winning.

- The coach must be generous with praise when it is deserved. The coach must criticize softly, praise loudly.

- Foul and abusive language, taunting or insulting gestures are not to be used or directed towards students, officials, or any other person associated with the activity or contest.

- It is expected the head coach will exercise mature judgment and give ample time of consideration before removal of a student from an athletic team. Notification to the Athletic Administrator should be given within twenty-four hours if a student is requested for removal from a team. When the head coach requests removal of a student athlete from the team, the coach must prepare the necessary information to present to the administration pertaining to the removal of the athlete from the squad. The administration will investigate and follow-up on the coach's request.

14.     The WCSD Board Policy 9201 takes an explicit position against the bullying of students. It makes clear WCSD expects all school facilities and school-sponsored events to be free from conduct which creates, or is reasonably certain to create, an intimidating or hostile educational environment. It prohibits conduct that substantially interferes with or impairs a student's educational performance or ability to participate in or benefit from school services. Faculty and staff

members found to be in violation of this policy may be subject to disciplinary action. The policy does not provide an exception for football coaches.

15.     The Galena High School Handbook prohibits bullying. It provides students, parents, and teachers with resources and mechanisms for reporting bullying and training to ensure a safe and respectful environment conducive to learning. The handbook does not provide an exception for football coaches.

16.     The Washoe County job description for head football coach describes the responsibilities and conduct expected of a head football coach. The coach is to develop a rapport with students, provide sound leadership, and set an example of good sportsmanship.

17.     Plaintiff LEMUS, 18, an honors student at Galena High School with a weighted GPA of 3.61 (at the end of junior year), is an outstanding athlete in baseball, track, and football. LEMUS won recognition in all three sports at Galena High. At the start of the 2016 school year, LEMUS was honored to be voted co-captain of the varsity football team. Football was especially meaningful to LEMUS because it provided him with opportunities to travel, to meet people, and to feel confident. Most importantly, LEMUS understood football had the potential to open college opportunities and scholarships that might impact the rest of his life.

18.     Plaintiff MADISON, 18, an honors student at Galena High School with a weighted GPA of 3.62 (at the end of junior year), is an outstanding athlete in golf and football, winning recognition in both sports during his high school career. At the start of the 2016 school year, MADISON was honored to be voted co-captain of the varsity football team. MADISON's best days were being out at practice with the team, having fun, and gearing up for a big game. MADISON trained hard for many years, at a variety of gyms and with personal trainers. MADISON hoped for an outstanding 2016 football year that would assist him in gaining the attention of college recruiters.

19.     Plaintiff BERGER, 18, an honors student at Galena High School with a weighted GPA of 4.02 (at the end of junior year), is an outstanding athlete in baseball, track, and football, winning recognition in football during his high school career. At the start of the 2016 school year, BERGER was honored to be voted co-captain of the varsity football team. BERGER approached football with a serious dedication, preparing strenuously for his senior year by training countless hours with personal trainers at a variety of gyms. BERGER was hopeful of securing a college football scholarship and hoped to gain the attention of college recruiters.

20.     Plaintiffs LEMUS, MADISON, and BERGER, star athletes, excellent students, and popular with other students, looked upon their senior year as the culmination of their football dreams and aspirations. Each was cognizant their football performance was key to future college opportunities. Each had preliminarily received strong interest from college recruiters.

21.     LEMUS, MADISON, and BERGER at all times took seriously the directives from head football coach STRUZYK as to how they were to behave both on and off the field. However, at no time did STRUZYK inform LEMUS, MADISON, or BERGER that they should abstain from pre-workout over-the-counter nutritional supplements. The National Federation of State High School Associations ("NFSHSA") places the responsibility on coaches, athletic directors, and other school personnel to address the prevalence of nutritional supplements with their players. According to the NFSHSA, it is the responsibility of coaches to have conversations with athletes and their parents about the potential dangers of nutritional supplements. STRUZYK did not inform LEMUS, MADISON, and BERGER, or any other athlete, not to purchase over-the-counter nutritional supplements to help build muscle and provide energy.

22.     LEMUS, MADISON, and BERGER heard STRUZYK advise players not to drink Red Bull or Monster drinks prior to practices and games but never heard him say anything about

legally purchased over-the-counter nutritional or pre-workout drinks or supplements. Accordingly, LEMUS, MADISON, and BERGER reasonably believed over-the-counter supplements were not prohibited. Further, LEMUS, MADISON, and BERGER regularly observed a majority of the varsity football team regularly consuming such nutritional or pre-workout drinks in the locker room before practices and games.

23.     In fact, LEMUS, MADISON, and BERGER heard STRUZYK encourage his players to take supplements. STRUZYK told LEMUS before the Hug High game on September 2, 2016, "Take one scoop of this (a powdery substance) and a packet of this." When LEMUS told STRUZYK he was already drinking Pedialyte for dehydration, STRUZYK told him to "take it anyway and tell everyone else to take it." LEMUS saw STRUZYK approach other players urging them to take the same supplements.[1]

24.     STRUZYK told MADISON before the Hug High game on September 2, 2016, "Just mix these two powders into a water bottle and drink it." MADISON heard STRUZYK tell other players it was to "help with hydration." MADISON saw his mother before the game who asked what MADISON was drinking. MADISON truthfully told her he had "no idea" but STRUZYK had told him to drink it.

25.     In early September, 2016, BERGER purchased a nutritional supplement known as "Boost Elite" online at Amazon. Boost Elite is advertised to increase the level of testosterone in the body, build leaner, harder muscle mass, melt away the body's excess fat, deliver fast gains in strength, and increase stamina and energy with all natural ingredients. It is made from Tribulus Terrestris Extract, Horny Goat Weed, Fenugreek Extract, Amino Acid and Vitamins, Glutamine Peptides, Green Tea Extract, Taurine, L-Arginine, and Beta Alanine. LEMUS, MADISON, BERGER, and three other students, Lane Scolari, Hayden Werbeckes (a nephew of STRUZYK),

---

[1] BERGER observed coaches disperse G2 chew supplements before games and at half times.

and Alex Oggerino all took Boost Elite for a very limited period.

26.    On Friday, September 16, 2016, shortly before lunch, in response to an anonymous "tip" made to the school, LEMUS, MADISON, and BERGER received instructions to come to the vice principal's office. LEMUS, MADISON, and BERGER had no idea why they were called into the office. Assistant Principal Freeman Holbrook ("Holbrook") and Dean of Students David Hawley ("Hawley") warned LEMUS, MADISON, and BERGER they had to be "honest" about the questions they would be asked or they would suffer a possible school suspension. Holbrook and Hawley asked LEMUS, MADISON, and BERGER whether they had taken any pills or supplements. The Plaintiffs admitted to taking Boost Elite, and explained it was a pre-workout plant based nutritional supplement. Hawley insisted on knowing the names of other players who had taken Boost Elite. The Plaintiffs truthfully provided the the names of all players they knew to have taken the supplement. Hawley said he "didn't know" if Boost Elite was legal or illegal but school officials were at that moment checking it out.

27.    While LEMUS, MADISON, and BERGER waited, Hawley telephoned their parents, informing them that the ingredients label from Boost Elite had been forwarded to the Nevada Interscholastic Activities Association ("NIAA") for a ruling on its legality. Hawley informed the parents that if the supplement was deemed to contain any banned substances, a limited suspension could occur.

28.    LEMUS, MADISON, and BERGER waited while Boost Elite was scrutinized. When Hawley returned, he said: "It's your lucky day boys, Boost Elite is not illegal." Hawley said LEMUS, MADISON, and BERGER would not be disciplined or be penalized in any way by the school. Hawley said Boost Elite was not banned; it was approved by the NIAA. Hawley added that despite the legality of Boost Elite, the parents of all three Plaintiffs would be called to come to the

school to sign a "waiver" before the Plaintiffs could play in that evening's game.

29.     Hawley telephoned the parents of LEMUS, MADISON, and BERGER, informing them that the NIAA had "cleared" Boost Elite and found nothing in it to be on the NIAA "banned list." Hawley told the parents that he (Hawley) was "not concerned" about Boost Elite, the school just wanted to be careful.

30.     On Friday, September 16, 2016, at or about 1:40 p.m., well after the school and the NIAA had found Boost Elite to be a non-prohibited substance, STRUZYK called all of the senior varsity football players, including LEMUS, MADISON, and BERGER, into the locker room. STRUZYK slammed the doors. STRUZYK placed a trash can in the middle of the room and with dramatic flourish ripped up the captain's papers for LEMUS, MADISON, and BERGER. STRUZYK threw the ripped captains papers in a trash can he had positioned nearby. STRUZYK condemned LEMUS, MADISON, and BERGER as a disgrace and unsuitable to be captains. STRUZYK said LEMUS, MADISON, and BERGER were "selfish" and "too selfish to be captains on the team." STRUZYK, said disgustedly: "I am going to have a hard time looking some of you in in the eye." Before leaving the room, STRUZYK asked who knew about or who took supplements? LEMUS saw half the team raise their hands.

31.     LEMUS, MADISON, and BERGER were humiliated. LEMUS, MADISON, and BERGER, had taken Boost Elite for a very limited period of time. Other players had taken supplements without punishment or problem, but now the three of them were being singled out for public shame and humiliation. Further, STRUZYK had for years encouraged players to take supplements that he provided, without problem. LEMUS, MADISON, and BERGER were astonished to be ostracized when STRUZYK was aware that almost every member of the team took some sort of over-the-counter supplements.

32.     On Friday, September 16, 2016, at or about 4:00 p.m., the parents of LEMUS, MADISON, and BERGER arrived at the Galena High School parking lot before the 7:00 p.m. game hoping to find STRUZYK. The parents had been told their sons were now not captains. The parents wanted to discuss the situation with STRUZYK. When STRUZYK arrived, he greeted the parents with hostility. STRUZYK, a very large man, came at them with his chest out, his arms back, his chin up. He got within eighteen inches of MADISON's father and began screaming. "The varsity team is my team and I'll do what I want and do it my way." STRUZYK's attitude was confrontational and aggressive. When the parents asked if their sons would play that night, STRUZYK said: "I'll decide who plays and who doesn't play." STRUZYK sarcastically mocked the parents stating, "If you don't like it, you can hit the highway." STRUZYK told the stunned parents their sons were "cancers" on the team. STRUZYK pointed to BERGER's parents and said: "Your kid is a bully." The parents urged STRUZYK to meet with them individually as soon as he could to discuss this. STRUZYK agreed but later refused to do so.

33.     On Friday, September 16, 2016, shortly before the 7:00 p.m. game time, STRUZYK called the varsity team into a huddle at the end zone. STRUZYK announced, "Has everyone apologized that needed to?" STRUZYK made it clear that anyone who had not apologized, would not play that night. All three Plaintiffs apologized to the team. Lane Scolari and Hayden Werbeckes also apologized but Alex Oggerino did not.

34.     On Monday, September 19, 2016, at or about 1:45 p.m., STRUZYK called LEMUS into his office. STRUZYK shut the door for what was to be a private meeting. STRUZYK gestured to Assistant Coach Cirillo ("Cirillo"), also sitting in the room, telling LEMUS, in a mocking hostile tone, "I have a witness so you can't go home to your parents and lie about this meeting." STRUZYK made clear the meeting would not be to "move the team forward" or to work on

"resolving issues." The meeting was about subjugation and humiliation. LEMUS resolved to be as polite and courteous as he could be and take whatever STRUZYK dished out.

35.   STRUZYK began the meeting by taunting LEMUS with name-calling. STRUZYK called LEMUS a "cancer" on the team.[2] STRUZYK demanded that LEMUS admit to wrongdoing in taking Boost Elite. LEMUS truthfully said he believed at the time Boost Elite was a legal substance when he took it, it was sold online and over-the-counter. LEMUS accurately said that he believed it to be a vegetable based, legal vitamin/herbal supplement. LEMUS said Boost Elite was determined legal by the NIAA and, because it was determined legal, the school did not punish anyone who took it. LEMUS told STRUZYK he would not take Boost Elite again. LEMUS apologized for taking Boost Elite but made clear on the two occasions he had taken it, he believed it to be a legal supplement. LEMUS also explained that the entire team was taking some variety of supplements and believed STRUZYK to be aware of this.

36.   STRUZYK became enraged. STRUZYK yelled at LEMUS, stepping within inches of LEMUS, who stood there and took it. STRUZYK was infuriated that LEMUS believed Boost Elite was not harmful. STRUZYK continued to call LEMUS, disgustedly, a "cancer" on the team. STRUZYK's words were sarcastic and mocking and his tone belittling. LEMUS was intimidated, he was frightened of the much larger man in a position of authority screaming at him and calling him names. STRUZYK insisted LEMUS agree with everything he said. LEMUS, sensing STRUZYK was "over the line," refused to agree he was a "cancer" on the team. LEMUS stood up to STRUZYK's bullying and resisted it.

37.   The meeting went downhill from there. STRUZYK accused LEMUS of not being a

---

[2] STRUZYK and other Galena coaches routinely engaged in a long list of caustic, malicious, and sneering remarks toward student athletes. STRUZYK's calling LEMUS a "cancer" was par for the course. LEMUS has been asked by football staff, in STRUZYK's presence, "Did your boyfriend go to hard on you last night?" "Do you need Vagisil?" "Stop thumbing yourself." "What, does your vagina hurt today?" Coaches called players "dumb ass" "retard" and "pussy" everyday.

leader on the team and taunted him for taking the legal supplement. LEMUS appropriately defended himself, speaking out against STRUZYK's bullying by explaining he worked hard in STRUZYK's class, in weights, and in practice. LEMUS understood STRUZYK was bullying him and was behaving inappropriately. LEMUS stood up to STRUZYK's unlawful bullying by politely and respectfully refusing to admit to any intentional wrongdoing while making clear his devotion to the game and to the team. LEMUS stated if he "hadn't loved the team he would not have played his entire senior season with a broken rib and stomach ulcers."

38.     The interview droned on, lasting well over one hour. STRUZYK accused LEMUS of "pushing" illegal supplements to team members. STRUZYK behaved as if LEMUS was selling drugs. LEMUS, shocked and intimidated at being called a drug dealer, adamantly denied he was selling anything. "I'm not selling anything," LEMUS told STRUZYK. STRUZYK sneered, "Well, who is?" LEMUS responded, "No one." The same questions were repeatedly asked over and over with STRUZYK alternatively telling LEMUS he was a "cancer" on the team and sarcastically mocking him.

39.     LEMUS stood up to STRUZYK's bullying and intimidating conduct and made clear he had a right to defend himself against bullying, false accusations and illegal conduct. At all times LEMUS understood he had the right to oppose STRUZYK's false accusations and intimidation. Yet, STRUZYK would not leave LEMUS alone. LEMUS asked if the meeting could be "over." STRUZYK would not let up. STRUZYK was not interested in developing a rapport with LEMUS or moving the team forward. STRUZYK's sole goal was the subjugation, domination, and control of LEMUS and to force LEMUS to understand he (STRUZYK) was in total charge of LEMUS' future.

40.     When LEMUS refused to admit to illegal conduct, STRUZYK mocked LEMUS,

sneering: "God, you're such a victim." LEMUS allowed the older, far bigger man who was an authority figure to ridicule him and stood there.

41.     STRUZYK tried to intimidate LEMUS into quitting the team. STRUZYK sarcastically asked LEMUS, "Do you still want to be on this team?" LEMUS immediately replied that he did. LEMUS said, "I wouldn't have played all season long with a broken rib and stomach ulcers if I didn't want to be on the team." LEMUS began to clearly understand, however, that STRUZYK did not want him on the team. After one hour of yelling, sarcasm, and name calling, it became increasingly obvious that STRUZYK wanted him off the team. LEMUS began to feel himself blacking out as the meeting continued, and he could not concentrate. This was a cataclysmic nightmare for LEMUS. The football team and the opportunities it presented meant everything to him. LEMUS could not fathom why STRUZYK was behaving in such an outrageous fashion, as if he hated him.

42.     STRUZYK mocked LEMUS' performance at the Friday night game, sneering: "You're not that good. I only let you play Friday night because I knew you would lose." STRUZYK made clear he wanted LEMUS to lose. LEMUS thought he was in an alternate universe; what kind of coach wants his players to lose? STRUZYK aggressively taunted LEMUS, stating he alone had control of LEMUS' football future and could do whatever he pleased with LEMUS and his future. "I'm in charge, not you, and not anyone else. I make the rules and you do what I say." STRUZYK belittled LEMUS again by calling him a "cancer" to the team. When LEMUS objected to being called a "cancer," STRUZYK laughed at him.[3]

43.     LEMUS did his best to verbally express his opposition to STRUZYK's bullying while remaining respectful and nondisruptive. LEMUS knew STRUZYK was bullying him and

---

[3] The Galena team lost the Friday night game. The Athletic Director mocked LEMUS at halftime in the locker room: "The way you guys are playing, you should have taken your testosterone boosters!"

14

opposed it: "I'm not the kind of person to bend over and take this," LEMUS said. STRUZYK responded, "You better learn to bend over if I tell you to." STRUZYK threatened, "I determine who gets the ball, I determine who plays, and I determine who gets stats for college." STRUZYK warned if LEMUS protested or said anything STRUZYK did not like, STRUZYK could and would withhold any and all assistance to LEMUS' college football prospects.

44.     LEMUS' speech, in defense of himself and in opposition to STRUZYK's bullying, resulted in STRUZYK's clear desire to punish him. It was clear STRUZYK wanted LEMUS off the team and that was the last thing LEMUS wanted. It was further clear that LEMUS's speech in challenging STRUZYK's bullying, refusing to "bend over" when STRUZYK insisted he "bend over" had caused STRUZYK to want LEMUS off the team. Football meant the world to LEMUS. STRUZYK's behavior left no doubt that STRUZYK viewed LEMUS as a disgusting, pathetic, object of derision for which he (STRUZYK) had nothing but contempt. LEMUS, seeing no other option, devastated by STRUZYK's antipathy and apparent hatred, laid his football equipment on the ground and said, "Thanks for the opportunity."[4]

45.     LEMUS at no time "quit" the team. LEMUS was constructively terminated because he spoke out against STRUZYK's bullying. LEMUS' refusal to "bend over" when STRUZYK said he must "bend over" was speech in opposition to STRUZYK's bullying. LEMUS' refusal to agree he was a "cancer" when STRUZYK insisted he was a "cancer" was speech was in opposition to STRUZYK's bullying. LEMUS' objection to being called a "drug dealer" when STRUZYK insisted LEMUS admit to drug dealing, was speech opposing STRUZYK's bullying.

46.     In speaking out against STRUZYK's intimidation, humiliation and false accusations, LEMUS was speaking out in furtherance of WCSD's public policy against bullying. In using speech to refuse to allow himself to be bullied, LEMUS utilized protected speech and was retaliated against

---

[4] Since LEMUS' removal from the team, LEMUS has heard from players on the team that STRUZYK continues to refer to him, MADISON, and BERGER as "cancers on the team."

by more bullying and more outrageous intimidation by an authority figure. STRUZYK's bullying, name-calling, and aggressive intimidation substantially interfered with LEMUS' ability to participate in or benefit from the services, activities or privileges provided by the school.

47.    Following STRUZYK's interrogation of LEMUS, STRUZYK called MADISON into his office and closed the door.[5] STRUZYK pointed to LEMUS' pads and gear on the floor and sarcastically asked: "Are we going to have another one of these meetings?" STRUZYK was immediately confrontational, asking MADISON, "Did you do anything wrong?" MADISON answered he did not believe he did. MADISON said when he took Boost Elite, he believed it to be a plant based nutritional vitamin/herbal supplement. He knew it had been purchased over-the-counter on Amazon. STRUZYK attempted to provoke MADISON into quitting the team. "Why do you still want to be a part of the team?" "Do you still feel like a leader?" "Do you have a 'problem' with the team?" MADISON denied having a problem with the team. MADISON stood his ground and respectfully responded to STRUZYK's questions. STRUZYK again asked MADISON, "Do you want to be part of the team?" MADISON replied that he did. After approximately twenty minutes, STRUYZK ended the meeting. MADISON left the meeting confident he was still on the team.[6]

48.    On Monday, September 19, 2016, at approximately 3:20 p.m., STRUZYK called BERGER into his office and closed the door. Coach Cirillo was also present. STRUZYK asked BERGER if he had "done anything wrong" and if he "wanted to quit the team?" BERGER said he

---

[5] After LEMUS left the room, LEMUS telephoned his parents and alerted them to the situation. LEMUS felt suicidal. LEMUS' parents called the parents of MADISON and BERGER who immediately called BROWN to alert him their children were being savagely interrogated. It is believed and alleged that BROWN then contacted STRUZYK to ask what was going on. It is believed that STRUZYK told BROWN he was having meetings with LEMUS, MADISON, and BERGER to move the team "forward."

[6] STRUZYK did not call MADISON the names he had called LEMUS, but MADISON had heard plenty of sarcastic put-downs made either by STRUZYK or by other coaches in STRUZYK's presence such as: "Shut up, you fucking retard!" "Clean up the weight room you crack babies" "Did your boyfriend go too hard on you last night?" and "Two Ass." The football coaches reference to team members as "Retard," "Dumb ass," and "Pussy" was everyday occurrence. MADISON once heard STRUYZK openly brag, after intimidating a school district employee, "I'm pretty bad ass!"

did not want to quit. STRUZYK, egging him on, trying to provoke him, said, "Well, you've thought about quitting haven't you?" BERGER denied he had thought about quitting. BERGER, refusing to take the bait and enrage the hot headed coach, said as little possible. BERGER said, "I just have fun and play ball." STRUZYK was not satisfied, taunting BERGER, "You only played Friday because I had a good feeling that you were going to get beat, and I wanted you to get beat." Again, BERGER was encouraged to quit the team. Cirillo asked, "Do you want to quit?" with STRUZYK nodding in agreement. BERGER emphatically said, "No, I don't want to quit!" STRUZYK told BERGER, "The only reason I allowed you to play Friday night was because I knew the team would lose and I wanted you out on the field to lose." STRUZYK told BERGER, "Leave this meeting now. You have to figure this shit out. Can you be part of the solution not part of the problem?"[7] BERGER left the meeting confident he was still on the team.

49.     STRUZYK did not call Lane Scolari, Hayden Werbeckes, or Alex Oggerino into his office for a private meeting even though they too had taken Boost Elite. STRUZYK knew these players had also taken Boost Elite, but STRUZYK did not to subject them to private interrogations and public humiliation.

50.     On Monday, September 19, 2015, after all the private meetings, STRUZYK took MADISON and BERGER into the weight room with the rest of the varsity team to deliver a largely unintelligible message. STRUZYK stated, "I'm not here to make anyone quit. I'm not here trying to kick guys off teams but this is adversity. You've got to figure this shit out." From STRUZYK's statement, MADISON and BERGER understood STRUZYK was open to resolution. MADISON and BERGER felt STRUZYK was aware he had gone too far with LEMUS and it was now their responsibility as leaders to get the team moving forward. MADISON and BERGER, concerned

---

[7] STRUZYK did not call BERGER the names he had called LEMUS, however, BERGER had heard plenty of sarcastic put-downs made either by STRUZYK or by other coaches in STRUZYK's presence. BERGER heard STRUZYK and other coaches use name calling such as: "retard," "dumb ass," and "pussy" on an everyday basis.

about team-mate LEMUS, were resolved to do just that.

51.     On Tuesday, September 20, 2016, at or about 9:00 a.m., BERGER's parents met with Principal BROWN to discuss STRUZYK's conduct. BROWN, as Galena High School principal, was STRUZYK's superior. BROWN had the ability, the right, and the obligation to train all employees at Galena High School, including STRUZYK in the prevention of bullying. BROWN had the ability to discipline and/or recommend discipline for STRUZYK for bullying.

52.     BROWN informed BERGER's parents that he was aware of STRUZYK's conduct, including his name-calling, bullying, and intimidating conduct toward football players, and approved of it. BROWN stated he was "aware" the interrogations by STRUZYK and approved of that too. BROWN told BERGER's parents, STRUZYK's actions had been taken to "move the team forward." When BERGER's parents told BROWN that STRUZYK referenced their son as a "cancer" and a "bully," BROWN defended STRUZYK, asserting that calling players "cancer" was permissible. BROWN explained, "The rules for the classroom are different than the rules for football." BROWN explained that STRUZYK was entitled to talk to students in any manner he pleased.

53.     On Tuesday, September 20, 2016 at or about 10:00 a.m., MADISON's parents met with Principal BROWN to discuss STRUZYK's conduct. BROWN informed MADISON's parents "his hands were tied" and there was nothing he could do. BROWN indicated he had no ability to curb STRUZYK's conduct and there was nothing he could do to change what had occurred.

54.     On Tuesday, September 20, 2016 at or about 12:00 p.m., LEMUS's parents met with Principal BROWN to discuss STRUZYK's conduct. BROWN informed LEMUS's parents that he was aware of the interrogations by STRUZYK and approved of that as the point was to "help the kids and the team come together." As for the name calling, BROWN defended that too. BROWN

said STRUZYK's calling LEMUS a "cancer" was "just football talk." BROWN said coaches talk that way "all the time." LEMUS' parents objected. BROWN elaborated, saying, "calling someone a cancer is just football speak." BROWN told LEMUS's parents that LEMUS had "quit the team." LEMUS's parents strongly objected, explaining LEMUS did not quit the team and was forced off the team by STRUZYK who made it clear he did not want LEMUS on the team. BROWN told LEMUS's parents there was nothing he could do. His hands were "tied."

55.     BROWN, as STRUZYK's superior, did not have his "hands tied." BROWN had many options available to him. BROWN could have insisted on immediate joint meetings with STRUZYK. BROWN could have called STRUZYK together with the parents and worked it out. BROWN could have gotten everyone in the same room to talk it over. Yet BROWN, paying great deference to STRUZYK, chose to do nothing.

56.     On Tuesday, September 20, 2016, Plaintiffs MADISON and BERGER spoke together about the need to get LEMUS back on the team and the team back on track. It was inconceivable to both MADISON and BERGER that STRUZYK would not want to fix things. MADISON and BERGER were aware of what had transpired between LEMUS and STRUZYK and believed they had the responsibility to try to return the team to normalcy with LEMUS as part of the team. MADISON and BERGER, as team leaders, believed they had a responsibility to LEMUS and to the team.

57.     On Tuesday, September 20, 2016, at approximately 11:30 a.m., Plaintiffs MADISON and BERGER decided to approach STRUZYK directly to resolve the problem. They had three objectives: 1) Get LEMUS back on the team; 2) Ask STRUZYK to apologize for the name calling, mockery, and humiliation; and, 3) Work with STRUZYK to get the team moving forward. Their goal was to reunite the team. As MADISON and BERGER approached STRUZYK's office.

STRUZYK said, "What's up, boys?" inviting them inside and closing the door. MADISON spoke out against the bullying and humiliation, "We came in to say with everything's that been going on with Jake, Mateo, and me, we think as a whole, it would be nice if you guys as a coaching staff apologize for how…"

58.     STRUZYK interrupted MADISON yelling, "No, not a chance!" MADISON said, "Why?" STRUZYK, leaping out of his chair, said: "Turn your shit in!" MADISON asked, "Why can't you apologize?" STRUZYK said, "There's nothing to apologize for. Get out of my office!" MADISON said, "Okay." STRUZYK sarcastically added, "Didn't work out for ya did it?" MADISON said, "What didn't work out?" STRUZYK responded, "Whatever it is you're planning!" and slammed the door in both their faces. MADISON and BERGER immediately understood the words, "Turn your shit in" to mean STRUZYK had kicked them off the team.

59.     MADISON and BERGER at no time "quit" the team. MADISON and BERGER were terminated from the team by STRUZYK because they spoke out against STRUZYK's bullying. MADISON and BERGER's speech, their words asking STRUZYK to apologize for his bullying conduct, resulted in STRUZYK's immediate retaliation against them. Absent MADISON and BERGER's speech in opposition to STRUZYK's bullying, they would still be on the football team.

60.     MADISON and BERGER left STRUZYK's office stunned. Both understood STRUZYK's words and conduct were in violation of school policy. Both understood that teammate LEMUS had been punished for his speech in opposition to STRUZYK's bullying and now they too had been punished for their speech.[8] MADISON and BERGER understood that in asking STRUZYK to consider apologizing for his over-the-top extreme hostility, they had been punished.

_____

[8] Since MADISON's and BERGER'S involuntary termination from the team, both have heard from friends on the team that STRUZYK continues to refer to each of them as "cancers on the team" and "poisons." The Plaintiffs have heard STRUZYK continues to bad mouth each of them saying, "I'm glad they're off the team, they're poison."

MADISON and BERGER understand that STRUZYK wanted them off the team and there was no way to interpret "Turn your shit in" other than they were involuntarily removed from the team.

61.     On Wednesday, September 22, 2016, MADISON and his parents met with Assistant Principal Teresa Burrows ("Burrows") and Holbrook. Burrows listened to the recounting of bullying and intimidation and agreed the conduct exhibited by STRUZYK was "intimidating."

62.     In early October, 2016, the parents of LEMUS, MADISON, and BERGER met separately with WCSD Area Superintendent JoEtta Gonzales ("Gonzales"). In these meetings the parents conveyed outrage that Plaintiffs were removed from the team involuntarily and "nothing was being done." The parents wanted a quick fix so the boys could complete the senior football season. The parents objected to calling their children "cancers" and insisting they must "bend over" if the coach demands it. The parents said STRUZYK had refused to meet with them and Galena High administration would not talk to them. The parents wanted action. The parents communicated that if the students were not immediately placed back on the team with another coach, it would be "too late."[9]

63.     Gonzales listened patiently, explaining that even if LEMUS, MADISON, and BERGER were allowed back on the team, there would still be "tension" as STRUZYK was the head coach. Gonzales agreed that STRUZYK's name-calling was not appropriate but there was nothing she could do. STRUYZK had violated public policy, violated the anti-bullying provisions of state and county law, yet LEMUS, MADISON, and BERGER would pay for STRUZYK's unlawful conduct with Gonzales' overt approval. Gonzales, seeing no urgency, explained she had authorized an "investigation." Meanwhile, LEMUS, MADISON, and BERGER were left with no solution. LEMUS, MADISON, and BERGER needed immediate relief, not an "investigation" that might take months.

_____

[9] If the Plaintiffs did not finish their senior year of varsity football, it would have a very negative effect on their ability to be considered for college football and recruitment. Finishing their senior year on the team was vital.

21

64.     On or about December 14, 2016, Gonzales sent a formal letter to the parents of LEMUS, MADISON, and BERGER with official findings that there was "not enough corroborating evidence" to substantiate a violation of the WCSD policy anti-bullying policy. The investigation was over.

65.     LEMUS, MADISON, and BERGER, once sought after by a variety of college recruiters, saw their college opportunities decline. The recruiters who previously had called them and written letters, now would not return their calls. They were informed that because they had not completed their senior football year, they would not be considered for scholarships.

66.     WCSD has a mandatory duty of care to properly and adequately train, supervise, and discipline its employees so as to avoid unreasonable risk of harm to students from bullying. Defendants, each and all, failed to take necessary, proper, or adequate measures in order to prevent the violation of Plaintiffs' rights. Defendants, inclusive, breached their duty of care to Plaintiffs in that they failed to adequately train, supervise and discipline STRUZYK to avoid bullying and to prevent retaliation for speech in opposition to bullying. This lack of adequate supervisorial training demonstrates the existence of an informal custom or policy of promoting, tolerating, and/or ratifying with deliberate indifference the bullying of Plaintiffs in violation of WCSD policies and the retaliation for speech in opposition to bullying.

67.     Plaintiffs allege STRUYZK was motivated to retaliate against them for their speech because STRUZYK believed anti-bullying policies did not apply to him. In this belief he was supported by BROWN. STRUZYK felt free to ignore public policy concerns against bullying because football coaches were encouraged, at least by BROWN, to bully, humiliate, name-call, taunt, and sarcastically mock team members.

68.     Plaintiffs allege BROWN and WCSD agreed with STRUZYK that football coaches

were an exception to the anti-bullying policies and it was normal, appropriate, and correct for STRUZYK to engage in name-calling, humiliation, and intimidation towards players.

69.     Plaintiffs allege STRUZYK and BROWN violated the anti-bullying provisions NRS 288.122, the WCSD Handbook for Activities & Athletics, the Galena High School mission statement, and WCSD Policy 9201, by engaging in bullying, intimidating, and humiliating conduct, in violation of public policy—all of which do apply to football coaches.

70.     Plaintiffs allege STRUZYK removed them from the football team because of their speech in opposition to his bullying and not because they took the supplement Boost Elite. The supplement was cleared by the school and the NIAA and other players, namely Lane Scolari, Hayden Werbeckes, and Alex Oggerino also took Boost Elite, and were not removed from the team.

71.     Plaintiffs allege opposition to bullying is akin to political speech and in furtherance of and consistent with, public policy. Speech that advances the goals of the public and is specifically authorized by state and county law and public policy is protected speech.

72.     Plaintiffs allege they at all times conducted themselves respectfully with STRUZYK in their private communications with STRUZYK and caused no disruption or disturbance at Galena High School: No classes were cancelled, no widespread disorder occurred, and no rights of other students to be left alone were impinged upon.

73.     Plaintiffs allege STRUYZK's retaliatory actions would chill a similarly situated student from engaging in protected activity, specifically speaking out in opposition to teacher bullying.

74.     Plaintiffs allege their protected expression was a substantial or motivating factor in STRUZYK's retaliatory actions.

75.     Plaintiffs allege absent their protected speech, they would not have been

involuntarily removed from the football team.

76.     Plaintiffs allege there was a causal connection between their protected speech and the adverse actions taken against them.

77.     Plaintiffs allege at no time did they act to undermine STRUZYK's authority as head football coach or refuse to participate in any activity ordered or expressed by STRUZYK

78.     Plaintiffs allege they at no time used obscene or abusive language to STRUZYK, nor were they insubordinate.

79.     Plaintiffs allege BROWN's failure to act to prevent STRUZYK's bullying and retaliation for speech in opposition to bullying, deprived the Plaintiffs of their rights under the First Amendment.

80.     Plaintiffs allege BROWN knew that STRUZYK engaged in bullying and in retaliation for speech in opposition to bullying, and knew or reasonably should have known, that STRUZYK's conduct would deprive Plaintiffs of their rights.

81.     Plaintiffs allege BROWN disregarded the known or obvious consequence that a lack of training on bullying and retaliation for speech in opposition to bullying, would cause STRUZYK to violate the Plaintiffs' constitutional rights and that deficiency actually caused STRUZYK to deprive Plaintiffs of their constitutional rights.

82.     Plaintiffs allege BROWN engaged in conduct that showed a reckless or callous indifference to the deprivation by STRUZYK of the rights of Plaintiffs.

83.     Plaintiffs allege BROWN's conduct was so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury.

84.     Plaintiffs allege BROWN failed to act pursuant to an expressly adopted official policy against bullying by his subordinate STRUZYK.

85.     Plaintiffs allege BROWN acted pursuant to a longstanding practice or custom of WCSD of allowing football coaches to bully students and to retaliate against students for speaking out against bullying.

86.     Plaintiffs allege WCSD'S longstanding practice or custom of permitting football coaches to bully and intimidate students caused the deprivation of Plaintiffs' rights by STRUZYK and BROWN.

87.     Plaintiffs allege the training policies of the WCSD were not adequate to train its employees, specifically its football coaches, to handle the usual and recurring situations with which they must deal.

88.     Plaintiffs allege the WCSD was deliberately indifferent to the obvious consequences of its failure to train its employees, specifically STRUZYK, to prevent bullying and to prevent retaliation for student speech in opposition to bullying.

89.     Plaintiffs allege the failure of the WCSD to provide adequate training caused the deprivation of the Plaintiff's rights by STRUZYK and BROWN; that is, WCSD's failure to train is so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury.

### DAMAGES

90.     Plaintiffs were physically, mentally, emotionally, and financially damaged as a result of being removed from the football team in retaliation for their speech against bullying. Plaintiffs allege their inability to complete their senior year of football has adversely affected their ability to obtain football scholarships and recruitment opportunities. College football coaches use a variety of means to identify high school football prospects. Four key methods include: 1) Gathering information on potential athletes from their high school coach; 2) Viewing game footage of the

player from his senior season; 3) Reviewing awards such as All-Conference and All-State awards from the senior season; 4) Evaluating an athlete's statistics from their senior season. STRUZYK's actions effectively foreclosed these avenues to Plaintiffs.

91.    Galena High School uses HUDL.com, a software service, to capture and share game film and highlights. These short highlight clips serve as one of the most critical recruiting mechanisms a player can utilize. After removal from the football team, STRUZYK removed the stats, film, and highlights for LEMUS, MADISON, and BERGER from Galena's HUDL account. This seriously interfered with Plaintiffs ability to share their performances with college programs and made it impossible for college recruiters to observe their performances.

### FIRST CAUSE OF ACTION
**First Amendment Retaliation – 42 U.S.C. Section 1983)**
**(All Plaintiffs Against All Individual and WCSD Defendants)**

92.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

93.    As set forth above, Plaintiffs engaged in protected speech under the First Amendment of the United States Constitution when they objected to and protested unlawful bullying. Plaintiffs were at all times entitled to verbally oppose and/or verbally challenge the conduct and/or misconduct of Defendants, as long as Plaintiffs were not disruptive.

94.    Defendants took retaliatory action against Plaintiffs by involuntarily removing them from the football team based on their verbal opposition to STRUZYK's bullying conduct.

95.    Plaintiffs' protected speech was a motivating factor in Defendants' involuntary removal of each of them from the football team.

96.    Defendants subjected Plaintiffs to these deprivations of their rights either maliciously, or with a reckless disregard for whether Plaintiffs' rights would be violated by their

1    actions.

2         97.    As a direct and proximate result of the aforedescribed unlawful and malicious

3    conduct by Defendants, committed under color of law and under their authority as governmental

4    employees, Plaintiffs suffered economic loss, physical and mental suffering, and emotional distress.

5    As a result, they were deprived of their right to be secure against violations of their rights under the

6

7    First Amendment of the United States.

8         98.    The acts of STRUZYK and BROWN were intentional, wanton, malicious and

9    oppressive and made with reckless indifference to Plaintiffs' rights, thus entitling Plaintiffs to an

10   award of punitive damages against the individual Defendants STRUZYK and BROWN.

11
                              **SECOND CAUSE OF ACTION**
12                                 **Municipal Liability**
                          **(All Plaintiffs Against Defendant WCSD)**
13

14        99.    Plaintiffs reallege and incorporate each and every allegation contained in the

15   preceding paragraphs.

16        100.   At all times herein mentioned, Defendant WCSD maintained a policy and/or a *de*

17   *facto* unconstitutional custom or practice of permitting, ignoring and condoning the bullying,

18   intimidation and name calling of STRUZYK towards his football team in general and toward

19   Plaintiffs in particular. WCSD knew STRUZYK's conduct was in violation of state and county laws

20   and in violation of public policy but permitted him to ignore such laws and policies. It was at all

21   times foreseeable that students would object to the bullying, speak out against the bullying, and be

22
     retaliated against for their speech.
23

24        101.   At all times herein mentioned, Defendant WCSD maintained two sets of rules and

25   regulations regarding bullying: One for the classroom and another for the football field. In the

26   classroom, bullying was prohibited. On the football field, bullying was accepted and even

27

28

1    encouraged.

2         102.    WCSD's failure to enforce the existing anti-bullying statutes, laws and policies, led

3    to Plaintiffs verbal objections and to the retaliation from those objections. The failure to adhere to

4    the existing laws against bullying was the legal cause of Plaintiffs' injuries, and each individual

5    Defendant acting in accord with this custom, policy or practice acted with deliberate indifference to

6    Plaintiffs.

7
         103.    WCSD's failure to train STRUZYK and BROWN of the current state and county

8    laws prohibiting bullying was the motivating factor of STRUZYK and BROWN's retaliation for

9    exercise of protected speech.

10
         104.    As a direct and proximate result of the aforedescribed unlawful and malicious

11   conduct by Defendants, committed under color of law and under their authority as governmental

12   employees, Plaintiffs suffered economic loss, physical and mental suffering, and emotional distress.

13   As a result, they were deprived of their right to be secure against violations of their rights under the

14   First Amendment of the United States.

15
                                 **THIRD CAUSE OF ACTION**

16
                  **(Negligent Hiring, Retention, Training, Supervision and Discipline)**
17               **(ALL PLAINTIFFS AGAINST WCSD)**

18       105.    Plaintiffs reallege and incorporate each and every allegation contained in the

19   preceding paragraphs.

20       106.    At all times mentioned herein, Defendant WCSD, by and through their agents and

21   employees, have and had, a mandatory duty of care to properly and adequately hire, train, retain,

22   supervise, and discipline its school district employees so as to avoid unreasonable risk of harm to

23   students. WCSD failed to take necessary, proper, or adequate measures in order to prevent the

24   violation of Plaintiffs' rights. WCSD failed to supervise subordinates regarding the deliberate

indifference to the necessity to protect students from bullying and from retaliation for their objections to bullying. Moreover, WCSD knew or should have known that this custom, policy, pattern or practice of permitting bullying by football coaches and retaliation by football coaches for protected speech in opposition to bullying, would lead to constitutional violations. This lack of adequate supervisorial training, and/or policies and procedures demonstrates the existence of an informal custom or policy of promoting, tolerating, and/or ratifying the continuing deliberate indifference to the Plaintiffs' constitutional rights.

107.   As a proximate result of WCSD's negligent conduct, Plaintiffs have suffered damages including severe emotional and mental distress and lost financial opportunities.

## FOURTH CAUSE OF ACTION
### (Negligence)
### (All Plaintiffs Against All Defendants)

108.   Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

109.   The Defendants owed a duty of care to Plaintiffs to refrain from retaliating against them for exercise of protected speech, and to abide by WCSD's policies, procedures, and rules related to anti-bullying of students.

110.   The Defendants breached their duty of care to the Plaintiffs by failing to ensure that STRUZYK and BROWN understood and abided by the anti-bullying provisions of the State of Nevada and County of Washoe and also understood that should students protest the bullying, intimidation, and name-calling of their football coach they must not be retaliated against for their speech.

111.   The Defendants conduct described herein is the but for and proximate cause of the damages suffered by the Plaintiffs.

29

112.   The Plaintiffs have suffered damages because of the negligence of the Defendants in an amount to be proven at trial.

### PRAYER FOR RELIEF

1. WHEREFORE, Plaintiffs pray for relief as follows:

2. Issue a judgment declaring that the actions of Defendants described herein are unlawful and violate Plaintiffs' rights under the constitution and laws of the United States.

3. For general damages in a sum according to proof;

4. For special damages in a sum according to proof;

5. For punitive damages in a sum according to proof;

6. For leave to amend or supplement the Complaint as new evidence is uncovered;

7. For declaratory relief;

8. For reasonable attorney's fees pursuant to U.S.C. Section 1983;

9. For cost of suit herein incurred; and,

10. For such other and further relief as the Court deems just and proper.

DATED This 3rd day of January, 2017

BY:

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28